UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | |
|---|---|
| **GLORIA PIERCE, CHRISTINE HUGHES,** and **MICHAEL FINLEY,** individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br>v.<br><br>**PREMIER HEALTH PARTNERS,**<br><br>      Defendant. | Case No.<br><br>Judge<br><br>Magistrate Judge<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Gloria Pierce, Christine Hughes, and Michael Finley (collectively, the "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action complaint against Defendant Premier Health Partners ("Defendant" or "Premier") to recover damages, restitution, and injunctive relief on behalf of a Class of persons whose personal identification information ("PII") and private health information ("PHI") (collectively, "PII/PHI" or "Private Information") was accessed without authorization by criminals as a result of Defendant's unreasonable and deficient data security practices.

Plaintiffs make these allegations on personal information as to those allegations pertaining to themselves and their personal circumstances, and upon information and belief, based on the investigation of counsel and facts that are a matter of public knowledge, on all other matters.

## I.    INTRODUCTION

1.    This class action arises out of a recent targeted cyberattack and data breach ("Data Breach") on Premier's computer network that resulted in unauthorized access to Private

Information of Premier's clients. As a result of Premier's failure to secure its network, as described below, Plaintiffs and Class Members' names, addresses, dates of birth, genders, Social Security numbers ("personal identification information" or "PII") and medical and health insurance information, which is protected health information ("PHI" and collectively with PII, "Private Information") are now in the hands of criminals as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").[1]

2.    Premier is the "largest comprehensive health care system in Southwest Ohio", which offers access to preventive care, and major medical treatments and procedures with three acute-care hospitals, an extensive network of physicians, numerous affiliate organizations, and more than 100 locations across seven Ohio counties.[2] In its Notice of Privacy Practices, Premier states that it is "required by law to maintain the privacy of our patients' protected health information" and further promises not to use or disclose protected health information without authorization.[3] Additionally, Premier offers assurance that "in the *unlikely* event that there is a breach or unauthorized release of your protected health information, you will receive notice and information on steps you may take to protect yourself from harm." (emphasis added).[4]

3.    Premier owed a duty to Plaintiffs and Class Members to implement and maintain reasonable security measures to secure, protect, and safeguard their Private Information against unauthorized access and disclosure.

4.    Premier also had an obligation to ensure that any vendors or third parties it elects

---

[1] "Protected Health Information" as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

[2] https://www.premierhealth.com/about-premier/about-us/what-is-premier-health (last visited November 30, 2023)

[3] https://www.premierhealth.com/patient-and-visitor-guide/patient-guide/patient-rights-responsibilities-and-privacy (last visited November 30, 2023)

[4] *Id*.

to offload the Private Information of the Plaintiffs and Class Members that it was entrusted with would take reasonable measures to safeguard that data.

5.      In 2022, Premier's direct health care system alone employed approximately 30,000 individuals and serviced over two million patients.[5] Collectively, with its affiliate health organizations, Premier provides service to over eight million people.[6] As a result of inadequate security, Premier failed to protect the Private Information of over two million people who were associated with Premier's health care system. On information and belief, Defendant failed to comply with regulatory, ethical, and industry standards for cybersecurity and confidentiality of sensitive personal information and failed to timely prevent, detect, and adequately respond to a foreseeable data breach carried out by cybercriminals.

6.      As a result of Defendant's inadequate security, unauthorized persons who are criminal actors gained access to Defendant's systems on May 30, 2023, and accessed and obtained Plaintiffs and Class Members' Private Information (the "Data Breach").[7]  By October 23, 2023, Premier began to coordinate with Welltock, Inc. ("Welltock"), a software company utilized by Premier, to investigate the scope of data obtained in the Data Breach and notify patients.[8]

7.      On or about November 17, 2023, Welltock, working on behalf of Premier, mailed data breach notification letters to Premier's patients.[9]

8.      By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class

---

[5] https://www.premierhealth.com/about-premier/about-us/statistics-and-facts (last visited November 30, 2023)
[6] https://www.daytondailynews.com/business/premier-health-patients-involved-in-data-breach-impacting-84-million-people-tech-company-says/FMGMBV7QLRCTNGJ7I3PYKSXCMI/ (last visited November 30, 2023)
[7] https://www.Premier.com/about-us/legal/corporate-compliance/vendor-compliance/hipaahitech/cybersecurity-incident/ (last visited Sept. 20, 2023)
[8] Id.
[9] Id.

Members' Private Information, Defendant assumed legal and equitable duties to these individuals to safeguard and protect the Private Information from unauthorized access.

9.      The information affected in the Data Breach included personal identification information ("PII"), including, but not limited to, full names, dates of birth, and Social Security Numbers, in addition to private health information ("PHI"), including, but not limited to medical treatment and diagnosis information, health insurance information, and healthcare provider (collectively "PII/PHI" or "Private Information").

10.      Notice of the Data Breach was unreasonably delayed. Plaintiffs and Class Members were not notified until the middle of November 2023, more than 170 days after the Data Breach, giving the criminals a head start to commit identity fraud and theft.

11.      The exposed Private Information of Plaintiffs and Class Members can be, and in certain cases has been, sold to other identity thieves or on the dark web, a hidden network of black-market websites that serves as a "haven for all kinds of illicit activity (including the trafficking of stolen personal information captured through means such as data breaches or hacks)."[10]

12.      This Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its failure to protect the Private Information of Plaintiffs and Class Members.

13.      Until notified, Plaintiffs and Class Members had no idea that their Private Information had been compromised by the Data Breach and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. This risk will remain for the rest of their lives.

---

[10] https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited November 30, 2023).

14.     Plaintiffs and Class members bring claims for negligence, negligent entrustment, breach of implied contract, unjust enrichment, invasion of privacy, breach of confidentiality related to medical information, and disclosure of non-public information against Defendant, as the Private Information of Plaintiffs and Class Members was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of its inadequate information security practices;  (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities; and (iv) timely inform Plaintiffs and Class Members of the Data Breach. Defendant's conduct amounts to at least negligence, and violates federal and state statutes designed to prevent or mitigate this very harm.

15.     Plaintiffs and Class Members have suffered actual and present injuries as a direct result of the Data Breach, including: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft for their respective lifetimes; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of the Data Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the present and/or imminent injury arising from actual and/or potential fraud and identity theft posed by their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damages to and diminution in value of their personal data entrusted to Defendant with the reasonable understanding and expectation that Defendant would safeguard their Private Information against theft and not allow access to, and misuse of, their personal data by others; and (h) the continued risk to their Private Information, which remains in the possession

of Defendant, and which is subject to further injurious breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information. Plaintiffs and Class Members, at the very least, are entitled to damages and injunctive relief tailored to address the vulnerabilities exploited in the Data Breach and designed to protect Plaintiffs' and Class Members' Private Information.

16.     Defendant understands the need to protect the privacy of its customers and use security measures to protect its customers' information from unauthorized disclosure. As a sophisticated entity that maintains private and sensitive consumer information, Defendant further understood the importance of safeguarding Private Information. Yet Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class Members' Private Information was safeguarded, failing to take available steps to prevent unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiffs and Class Members was compromised through access to and exfiltration by an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

17.     Plaintiffs and Class Members by this action seek compensatory damages together with injunctive relief to remediate Defendant's failures to secure their and other Class Members' Private Information and to provide damages for, among other things, Plaintiffs and Class Members to secure identity theft insurance, and credit repair services for Plaintiffs' and Class Members'

respective lifetimes to protect the Class of Data Breach victims from identity theft and fraud.

## II.    PARTIES, JURISDICTION, AND VENUE

18.    Plaintiff Gloria Pierce ("Plaintiff Pierce") is a resident of Troy, Ohio.  Plaintiff Pierce received a Notice of Breach letter dated November 17, 2023, which notified her that her Private Information was accessed and stolen in the course of the Data Breach. A copy of her Notice is attached as Exhibit 1 to this Complaint.

19.    Plaintiff Pierce is protective of her Private Information.  Had she known that Premier would not adequately protect the Private Information entrusted to it, she would not have turned to Premier for health care services or agreed to provide Premier with her Private Information. She would not have chosen to depend on Defendant for medical services if she had known it would not, or could not, protect her Private Information.

20.    Plaintiff Christine Hughes ("Plaintiff Hughes") is a resident of Troy, Ohio.  Plaintiff Hughes received a Notice of Breach letter dated November 17, 2023, which notified her that her Private Information was accessed and stolen in the course of the Data Breach.

21.    Plaintiff Hughes is protective of her Private Information.  Had she known that Premier would not adequately protect the Private Information entrusted to it, she would not have turned to Premier for health care services or agreed to provide Premier with her Private Information. She would not have chosen to depend on Defendant for medical services if she had known it would not, or could not, protect her Private Information.

22.    Plaintiff Michael Finley ("Plaintiff Finley") is a resident of Troy, Ohio.  Plaintiff Finley received a Notice of Breach letter dated November 17, 2023, which notified him that his Private Information was accessed and stolen in the course of the Data Breach.

23.     Plaintiff Finley is protective of his Private Information.  Had he known that Premier would not adequately protect the Private Information entrusted to it, he would not have turned to Premier for health care services or agreed to provide Premier with his Private Information. He would not have chosen to depend on Defendant for medical services if he had known it would not, or could not, protect his Private Information.

24.     Defendant is a registered nonprofit corporation in Ohio with its headquarters at 110 N. Main Street, Dayton, OH 45402. Premier is an organized health care arrangement and covered entity as those terms are defined in 45 C.F.R. 160.103.

25.     Subject matter jurisdiction arises under 28 U.S.C. § 1332(d). This case is brought as a class action with an amount in controversy in excess of $5 million, exclusive of interest and costs, there are 100 or more proposed Class members, and at least one proposed Class member is a citizen of a state different from Defendant.

26.     This Court has personal jurisdiction over Defendant because Defendant transacts business in Ohio, committed tortious acts in Ohio, contracted with third-party companies in Ohio, and has its principal place of business in Montgomery County, Ohio.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the injuries in this case substantially occurred in this District and Defendant resides and/or is registered to do business and transact business in this District.

### III.    FACTUAL ALLEGATIONS

#### *Premier's Promises and Obligations Regarding Protection of PII/PHI*

28.     Premier is a multi-hospital health system operating in the Dayton, Ohio, area. Its system includes three hospitals and 65 other facilities including outpatient health centers, a primary

care physician group, home health care, psychiatric care, and health outreach programs.[11]

29.     Premier is an Ohio non-profit corporation launched in 1996. By 2021, Premier had revenue of $1.8 billion.[12]

30.     Premier expressly and impliedly promised Plaintiffs and Class Members that it will maintain the privacy and confidentiality of their Private Information, as follows:[13]

> "We are required by law to maintain the privacy of our patients' protected health information and to provide patients with notice of our legal duties and privacy practices with respect to protected health information."

31.     In the course of ordinary business operations, Premier requires its patients to trust it to safeguard their Private information.

32.     Premier owed Plaintiffs and Class Members numerous statutory, regulatory, ethical, contractual, and common law duties to safeguard and keep Plaintiffs' and Class Members' Private Information confidential, safe, secure, and protected from unauthorized disclosure, access, dissemination, and theft.

### *The Data Breach*

33.     Premier partners with Welltock, a company that creates software for health institutions. Welltock utilized MOVEit, an automated and managed file transfer server, to transfer Plaintiffs' and Class Members' sensitive data between its partners and to prevent unauthorized access to the Private Information when said data is being transferred between entities.[14]

---

[11] https://www.dnb.com/business-directory/company-profiles.premier_health_partners.b31b3edfb1d7e131eca7a26e52e1403a.html (last visited November 30, 2023)
[12] https://projects.propublica.org/nonprofits/organizations/311446699 (last visited November 30, 2023)
[13] https://www.premierhealth.com/patient-and-visitor-guide/patient-guide/patient-rights-responsibilities-and-privacy (Last visited November 30, 2023)
[14] https://www.daytondailynews.com/business/premier-health-patients-involved-in-data-breach-impacting-84-million-people-tech-company-says/FMGMBV7QLRCTNGJ7I3PYKSXCMI/ (last visited December 1, 2023)

34.    On or about May 28, 2023, Progress Software ("Progress"), parent company of MOVEit, discovered a vulnerability in MOVEit Software which allowed hackers to raid MOVEit transfer servers and steal customers' sensitive data stored within.[15]

35.    On or about May 31, 2023, Progress posted a warning to its customers on its website and issued a "patch" to thwart the hackers' activity.[16]

36.    Premier did not learn of the alleged compromise until October 23, 2023.[17]

37.    Currently, the full extent of the types of sensitive personal information, the scope of the Data Breach, and the details regarding how the Data Breach was carried out are all within the control of Premier, and its agents, counsel, and forensic security vendors.

38.    Sophisticated companies like Premier are aware of the different types of bad actors acting across the Internet and the type of criminal cybersecurity acts they employ for profit. Accordingly, it is imperative that Premier guard against those criminal exploits.

39.    Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

40.    Premier had a duty to adopt reasonable measures to protect Plaintiffs' and Class Members' Private Information from involuntary disclosure to third parties. Premier collected, maintained, and profited from information that it knew to be private and sensitive, and it was aware of the consequences to Plaintiffs and Class Members if it failed to adequately protect that

---

[15] https://www.reuters.com/technology/moveit-hack-spawned-around-600-breaches-isnt-done-yet-cyber-analysts-2023-08-08/ (Last visited December 1, 2023)

[16] https://community.progress.com/s/article/MOVEit-Transfer-Critical-Vulnerability-31May2023 (Last visited December 1, 2023)

[17] https://www.daytondailynews.com/business/premier-health-patients-involved-in-data-breach-impacting-84-million-people-tech-company-says/FMGMBV7QLRCTNGJ7I3PYKSXCMI/ (last visited December 1, 2023)

information. Premier breached its duty to Plaintiffs and Class Members and allowed an attacker

access to its systems without detection.

41.    Plaintiffs and Class Members are aware that the Private Information affected by the

Data Breach creates an imminent risk of identity theft.

42.    The kind of information exfiltrated in the Data Breach would make it possible for

malicious actors to carry out phishing attacks, social engineering, or identity theft, including

medical identity theft.

### *The Data Breach Was Preventable*

43.    Premier selected Welltock to utilize its software which relies on the MOVEit

transfer server for the file transfer of Plaintiffs' and Class Members' Private Information.

44.    The Data Breach could have been prevented by using a secure file transfer software,

securing and encrypting the Private Information of Plaintiffs and Class Members, implementing

additional procedures, and/or by implementing and following adequate procedures to monitor and

detect data breaches.

45.    Data breaches are preventable. As Lucy Thompson wrote in the DATA BREACH

AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could

have been prevented by proper planning and the correct design and implementation of appropriate

security solutions." She added that "[o]rganizations that collect, use, store, and share sensitive

personal data must accept responsibility for protecting the information and ensuring that it is not

compromised . . . ."[18]

46.    "Most of the reported data breaches are a result of lax security and the failure to

---

[18] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," in Data Breach and
Encryption Handbook (Lucy Thompson, ed., 2012).

create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[19]

47.    Defendant's negligence in safeguarding the PII/PHI of Plaintiffs and Class Members was exacerbated by the repeated warnings and alerts directed to U.S. companies warning that they should protect and secure sensitive data, especially in light of the substantial increase in cyberattacks specifically targeting healthcare providers. The healthcare industry is particularly vulnerable to cyberattacks, owing to their high propensity to pay a ransom, the value of patient records, and often inadequate security.[20]

48.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

49.    The ramifications of Defendant's failure to keep secure Plaintiffs' and Class Members' Private Information are long-lasting and severe. Once Social Security numbers and other PII/PHI have been stolen, fraudulent use of that information and damage to victims may continue for years.

### *The Data Breach Was Foreseeable*

50.    The FBI has been warning the healthcare industry about the threat posed by ransomware and others and to be on the lookout for attacks.

51.    The United States Cybersecurity & Infrastructure Security Agency, Department of

---

[19] *Id*. at 28.
[20] See https://www.hhs.gov/sites/default/files/clop-allegedly-targeting-healthcare-industry-sector-alert.pdf (last visited December 1, 2023).

Justice, and Department of Health & Human Services issued a Joint Cybersecurity Advisory as early as on October 28, 2020, warning of an acute threat to U.S. hospitals and healthcare providers and advising them on how to "ensure that they take timely and reasonable precautions to protect their networks from these threats."[21]

52.    Despite the well-known risks and the need for effective protections, unauthorized individuals were able to access Plaintiffs' and Class Members' Private Information.

53.    Defendant had specific obligations imposed on it by contracts and law to ensure the adequate protection of such information. For example, as a covered entity under HIPAA, Defendant was required to maintain the confidentiality and security of Plaintiffs' and Class Members' Private Information.

### *Defendant's Conduct Violates FTC Regulations*

54.    The Federal Trade Commission ("FTC") defines identify theft as "a fraud committed or attempted using the identifying information of another person without authority."[22]

55.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "name, Social Security number, date of birth, official State of government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[23]

56.    The ramifications of Defendant's failure to keep secure the PII and PHI of Plaintiffs and the Class are long lasting and severe. Once PII and PHI is stolen, particularly Social Security

---

[21] See https://www.cisa.gov/sites/default/files/publications/AA20302A_Ransomware%20_Activity_Target ing_the_Healthcare_and_Public_Health_Sector.pdf.pdf (last visited December 1, 2023).
[22] 17 C.F.R. § 248.201(b)(9)
[23] 17 C.F.R. § 248.201(b)(8)

numbers and driver's license numbers, fraudulent use of that information and damage to victims may continue for years.

57.    Defendant had specific obligations imposed on it by contracts and law to ensure the adequate protection of such information. For example, as a covered entity under HIPAA, Defendant was required to maintain the confidentiality and security of Plaintiffs' and Class Members' Private Information.

### *Defendant's Conduct Violates HIPAA Standards of Conduct*

58.    Defendant is regulated by the Health Insurance Portability and Accountability Act ("HIPAA") (45 C.F.R. § 160.102), and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C, which establish national security standards and duties for Defendant's protection of medical information maintained in electronic form.

59.    HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

60.    "Electronic protected health information" is defined as "individually identifiable health information ... that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

61.    HIPAA's Security Rule requires Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (b) protect against any reasonably

anticipated threats or hazards to the security or integrity of such information; (c) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (d) ensure compliance by its workforce.

62.    HIPAA also requires Defendant to "review and modify the security measures implemented ... as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and also to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

63.    The facts of the Data Breach establish that Defendant failed to comply with these Rules. The Data Breach resulted from a combination of inadequacies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations, including, but not limited to, the following:

a.    Failing to ensure the confidentiality and integrity of electronic PHI that Defendant creates, receives, maintains, and transmits, in violation of 45 C.F.R. section 164.306(a)(1);

b.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. section 164.312(a)(1);

c.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. section 164.308(a)(1);

d.  Failing to identify and respond to suspected or known security incidents and mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. section 164.308(a)(6)(ii);

e.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. section 164.306(a)(2);

f.  Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. section 164.306(a)(3);

g.  Failing to ensure compliance with HIPAA security standard rules by its workforce, in violation of 45 C.F.R. section 164.306(a)(4);

h.  Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. section 164.502, et seq.;

i.  Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. sections 164.530(b) and 164.308(a)(5); and

j.  Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI in compliance with 45 C.F.R. section 164.530(c).

***Defendant's Conduct Violates Ohio Standards for Healthcare Duty of Confidentiality and Authorization for Disclosure of Medical Information***

64.     Under Ohio law, a health plan may not disclose personally identifiable non-public information about a patient without the patient's express written authorization.

65.     Ohio Rev. Code § 3798.04 provides that a covered entity, such as a health plan, shall not "use or disclose protected health information without any authorization that is valid under 45 C.F.R. 164.508, and if applicable, 42 C.F.R. part 2, except when the use or disclosure is required or permitted without such authorization by Subchapter C of Subtitle A of Title 45 of the Code of Federal Regulations and, if applicable, 42 C.F.R. part 2."

66.     The Ohio Supreme Court has recognized that persons in possession of PHI owe a duty of confidentiality and that "an independent tort exists for the unauthorized, unprivileged disclosure to a third-party of nonpublic medical information that a physician or hospital has learned with a patient-physician relationship." *Biddle v. Warren Gen. Hosp.,* 68 Ohio St. 3d 395, 401 (1999).

67.     Confidentiality is a cardinal rule of the hospital/physician-patient relationship.

68.     Plaintiffs were aware of Defendant's duty of confidentiality, and as a result, have objectively reasonable expectations that Defendant will not share or disclose, whether intentionally or unintentionally, their Private Information in the absence of authorization for any purpose that is not directly related to or beneficial to patient care.

***Value of Personally Identifiable Information***

69.     The PII/PHI of individuals remains of high value to criminals, as evidenced by the prices they will pay for it on the dark web. Numerous sources cite dark web pricing for stolen

identity credentials. For example, personal information is sold at prices ranging from $40 to $200, and bank details have a price range of $50 to $200.[24] Criminals also can purchase access to entire sets of information obtained from company data breaches for prices ranging from $900 to $4,500.[25]

70.    Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

71.    The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[26]

72.    In addition, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against potential misuse of a Social Security number is not permitted; an individual instead must show evidence of actual, ongoing fraud to obtain a new number.

73.    Even then, a new Social Security number may not be effective. According to Julie

---

[24] Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-onthe-dark-web-how-much-it-costs/ (last accessed Sept. 20, 2023)

[25] In the Dark, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymousbrowsing/in-the-dark (last visited Sept. 20, 2023)

[26] Social Security Administration, Identity Theft and Your Social Security Number, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed December 1, 2023)

Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[27]

74.    Medical identity theft occurs when someone uses a person's name and sometimes other parts of their identity — such as insurance information — without the person's knowledge or consent to obtain medical services or goods, or uses the person's identity information to make false claims for medical services or goods. Medical identity theft frequently results in erroneous entries being put into existing medical records, and can involve the creation of fictitious medical records in the victim's name.[28]

75.    Medical identity theft may result in someone using another person's information to see a doctor, get prescription drugs, or to file claims with an insurance company in the person's name. If the thief's medical treatment or diagnosis mixes with the person's treatment or diagnosis, the victim's health is at risk.[29]

76.    Medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft.

77.    Indeed, a robust cyber black market exists in which criminals post stolen PII/PHI on multiple underground internet websites, commonly referred to as the dark web, to create fake insurance claims, purchase and resell medical equipment, or access prescriptions for illegal use or resale. According to a 2017 Javelin strategy and research presentation, fraudulent activities based

---

[27] Bryan Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015), available at: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-shackers-has-millionsworrying-about-identity-theft (last accessed December 1, 2023).
[28] See https://www.worldprivacyforum.org/category/med-id-theft/ (last visited December 1, 2023).
[29] See https://oag.ca.gov/privacy/facts/medical-privacy/med-id-theft (last visited December 1, 2023).

on data stolen in data breaches that are between two and six years old had increased by nearly 400% over the previous four years.[30]

78.    According to Experian, one of the three major credit bureaus, medical records can be worth up to $1,000 per person on the dark web, depending upon completeness.[31] PII/PHI can be sold at a price ranging from approximately $20 to $300.[32]

79.    Medical identity theft can also result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences since if a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[33]

80.    The Ponemon Institute found that medical identity theft can cost victims an average of $13,500 to resolve per incident, and that victims often have to pay off the imposter's medical bills to resolve the breach.[34]

81.    Based on the foregoing, the information compromised in the Data Breach is

---

[30] See Brian Stack, Here's How Much Your Personal Information is Selling for on the Dark Web (2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited December 1, 2023)
[31] Id.
[32] See https://www.privacyaffairs.com/dark-web-price-index-2021/ (last visited December 1, 2023).
[33] See Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, (2/7/14), https://khn.org/news/rise-of-indentity-theft/ (last visited December 1, 2023); see also, Medical Identity Theft in the New Age of Virtual Healthcare, IDX (March 15, 2021), https://www.idx.us/knowledge-center/medical-identity-theft-in-the-new-age-of-virtual-healthcare (last visited December 1, 2023)
[34] See Brian O'Connor, Healthcare Data Breach: What to Know About Them and What to Do After One, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited December 1, 2023)

significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, in that situation, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—name, birthdate, financial history, and Social Security number.

82.     This data commands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[35]

83.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

84.     The Private Information of Plaintiffs and Class Members was taken by hackers to engage in identity theft and/or to sell it to other criminals who will purchase the Private Information for that purpose.

85.     The fraudulent activity resulting from the Data Breach may not come to light for years.

86.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII/PHI is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[35] Time Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT World, (Feb. 6, 2015), available at: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10xprice-of-stolen-credit-card-numbers.html (last accessed December 1, 2023)

> As a result, studies that attempt to measure the harm resulting from
> data breaches cannot necessarily rule out all future harm.[36]

87.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII/PHI of Plaintiffs and Class Members and of the foreseeable consequences that would occur if the PII/PHI was exfiltrated, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members.

88.    Plaintiffs and Class Members now face a lifetime of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damage in addition to any fraudulent use of their Private Information.

89.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to (a) use a secure file transfer software, (b) properly secure and encrypt the PII/PHI of Plaintiffs and Class Members, (c) implement the additional procedures that were only implemented after the Data Breach, and/or (d) implement and follow adequate procedures to monitor and detect data breaches.

## IV.    PLAINTIFFS-SPECIFIC ALLEGATIONS

### *Plaintiff Gloria Pierce*

90.    Plaintiff Pierce receives health care from Premier and has since 2011. As a condition of obtaining treatment, Plaintiff Pierce provided her PII/PHI to Premier with the reasonable expectation that her PII/PHI would be maintained in a secure manner, and her PII/PHI would only be used for legitimate business purposes.

---

[36] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao. gov /assets/gao-07-737.pdf (last visited May 23, 2023).

91.     Plaintiff Pierce values her privacy and PII/PHI. Prior to the Data Breach, Plaintiff Pierce took reasonable steps to maintain the confidentiality of her PII/PHI.

92.     Premier used Welltok to manage its communications with patients. Welltock utilized the MOVEit transfer server provided by Progress Software to exchange files containing Plaintiff Pierce's and Class Members' PII/PHI across the Internet as part of its contracted services with Premier.

93.     Premier did not properly safeguard and protect Plaintiff Pierce's PII/PHI, leading to its exposure and exfiltration in the Data Breach.

94.     Furthermore, Premier did not provide notice of the Data Breach to its customers until the middle of November 2023.

95.     On or about November 29, 2023, Plaintiff Pierce received notice from Premier that her PII/PHI had been improperly accessed and/or obtained by unauthorized third parties in the Data Breach. The Notice stated to Plaintiff Pierce and Class Members that the type of information that may have been impacted included "your name and date of birth, social security number, treatment information/diagnosis, provider name, MRN, health insurance information, and treatment cost."

96.     In Premier's Notice, Plaintiff Pierce and Class Members are encouraged to "manage your accounts" and "further educate yourself regarding identity theft, fraud alerts, credit freezes, and the steps you can take to protect your personal information." *See* Exhibit 1.

97.     Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Pierce faces, Defendant offered her a one-year subscription to a credit monitoring service through Experian.

98.     As a result of the Data Breach, Plaintiff Pierce made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: spending a significant amount of time researching the Data Breach, and reviewing financial, healthcare, and other accounts for any indications of actual or attempted identity theft or fraud. Plaintiff Pierce spent time and energy dealing with the Data Breach—valuable time Plaintiff Pierce otherwise would have spent on other activities—including but not limited to work or recreation.

99.     As a result of the Data Breach, Plaintiff Pierce has suffered anxiety, emotional distress, and loss of privacy as a result of the release of her PII/PHI, which she reasonably believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her PII/PHI for purposes of identity theft and fraud. Plaintiff Pierce is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach. Plaintiff Pierce is also very concerned that her PII/PHI will be used to commit medical identity theft.

100.     Plaintiff Pierce suffered actual injury from having her PII/PHI compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII/PHI; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

101.     As a result of the Data Breach, Plaintiff Pierce anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Pierce is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### *Plaintiff Christine Hughes*

102.    Plaintiff Hughes receives health care from Premier and has since 2008. As a condition of obtaining treatment, Plaintiff Hughes provided her PII/PHI to Premier with the reasonable expectation that her PII/PHI would be maintained in a secure manner, and her PII/PHI would only be used for legitimate business purposes.

103.    Plaintiff Hughes values her privacy and PII/PHI. Prior to the Data Breach, Plaintiff Hughes took reasonable steps to maintain the confidentiality of her PII/PHI.

104.    Premier used Welltok to manage its communications with patients. Welltock utilized the MOVEit transfer server provided by Progress Software to exchange files containing Plaintiff Hughes' and Class Members' PII/PHI across the Internet as part of its contracted services with Premier.

105.    Premier did not properly safeguard and protect Plaintiff Hughes' PII/PHI, leading to its exposure and exfiltration in the Data Breach.

106.    Furthermore, Premier did not provide notice of the Data Breach to its customers until the middle of November 2023.

107.    On or about November 25, 2023, Plaintiff Hughes received notice from Premier that her PII/PHI had been improperly accessed and/or obtained by unauthorized third parties in the Data Breach. The Notice stated to Plaintiff Hughes and Class Members that the type of information that may have been impacted included "your name and date of birth, social security number, treatment information/diagnosis, provider name, MRN, health insurance information, and treatment cost."

108.    In Premier's Notice, Plaintiff Hughes and Class Members are encouraged to

"manage your accounts" and "further educate yourself regarding identity theft, fraud alerts, credit freezes, and the steps you can take to protect your personal information." *See* <u>Exhibit 1</u>.

109.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Hughes faces, Defendant offered her a one-year subscription to a credit monitoring service through Experian.

110.    As a result of the Data Breach, Plaintiff Hughes made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: spending a significant amount of time researching the Data Breach, and reviewing financial, healthcare, and other accounts for any indications of actual or attempted identity theft or fraud. Plaintiff Hughes spent time and energy dealing with the Data Breach—valuable time Plaintiff Hughes otherwise would have spent on other activities—including but not limited to work or recreation.

111.    As a result of the Data Breach, Plaintiff Hughes has suffered anxiety, emotional distress, and loss of privacy as a result of the release of her PII/PHI, which she reasonably believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her PII/PHI for purposes of identity theft and fraud. Plaintiff Hughes is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach. Plaintiff Hughes is also very concerned that her PII/PHI will be used to commit medical identity theft.

112.    Plaintiff Hughes suffered actual injury from having her PII/PHI compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII/PHI; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

113.    As a result of the Data Breach, Plaintiff Hughes anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Hughes is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### *Plaintiff Michael Finley*

114.    Plaintiff Finley receives health care from Premier and has for the duration of his life. As a condition of obtaining treatment, Plaintiff Finley provided his PII/PHI to Premier with the reasonable expectation that his PII/PHI would be maintained in a secure manner, and his PII/PHI would only be used for legitimate business purposes.

115.    Plaintiff Finley values his privacy and PII/PHI. Prior to the Data Breach, Plaintiff Finley took reasonable steps to maintain the confidentiality of her PII/PHI.

116.    Premier used Welltok to manage its communications with patients. Welltock utilized the MOVEit transfer server provided by Progress Software to exchange files containing Plaintiff Finley's and Class Members' PII/PHI across the Internet as part of its contracted services with Premier.

117.    Premier did not properly safeguard and protect Plaintiff Finley's PII/PHI, leading to its exposure and exfiltration in the Data Breach.

118.    Furthermore, Premier did not provide notice of the Data Breach to its customers until the middle of November 2023.

119.    In late November 2023, Plaintiff Finley received notice from Premier that his PII/PHI had been improperly accessed and/or obtained by unauthorized third parties in the Data Breach. The Notice stated to Plaintiff Finley and Class Members that the type of information that

may have been impacted included "your name and date of birth, social security number, treatment information/diagnosis, provider name, MRN, health insurance information, and treatment cost."

120.    In Premier's Notice, Plaintiff Finley and Class Members are encouraged to "manage your accounts" and "further educate yourself regarding identity theft, fraud alerts, credit freezes, and the steps you can take to protect your personal information." *See* <u>Exhibit 1</u>.

121.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Finley faces, Defendant offered him a one year subscription to a credit monitoring service through Experian.

122.    As a result of the Data Breach, Plaintiff Finley made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: spending a significant amount of time researching the Data Breach, and reviewing financial, healthcare, and other accounts for any indications of actual or attempted identity theft or fraud. Plaintiff Finley spent time and energy dealing with the Data Breach—valuable time Plaintiff Finley otherwise would have spent on other activities—including but not limited to work or recreation.

123.    As a result of the Data Breach, Plaintiff Finley has suffered anxiety, emotional distress, and loss of privacy as a result of the release of his PII/PHI, which he reasonably believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his PII/PHI for purposes of identity theft and fraud. Plaintiff Finley is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach. Plaintiff Finley is also very concerned that his PII/PHI will be used to commit medical identity theft.

124.    Plaintiff Finley suffered actual injury from having his PII/PHI compromised as a

result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII/PHI; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

125.    As a result of the Data Breach, Plaintiff Finley anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Finley is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V.    CLASS ALLEGATIONS

126.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of themselves and a Class defined as follows:

> All persons whose personal identification information or private health information was compromised in the Data Breach, including all persons who were sent a notice of the Data Breach on or after November 17, 2023.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

127.    **Numerosity**: The exact number of Class members is unknown to Plaintiffs, but individual joinder is impracticable. Upon information and belief, the members of the Class are so

numerous that joinder of each of the Class Members in a single proceeding would be impracticable. Upon information and belief, Premier provides medical care to over two million patients. The number and identities of Class Members can be ascertained through the Defendant's records.

128.    **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.      Whether Defendant unlawfully failed to secure Plaintiffs' and Class Members' PII/PHI;

b.      Whether Defendant failed to utilize safe and secure file transfer software and implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.      Whether Defendant failed to comply with applicable data security laws and regulations;

d.      Whether Defendant's data practices prior to and during the Data Breach were consistent with industry standards;

e.      Whether Defendant owed a duty to Plaintiffs and Class Members to safeguard their PII/PHI;

f.      Whether Defendant breached its duty to Plaintiffs and Class Members to safeguard their PII/PHI;

g.      Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

h.      Whether Defendant's conduct was negligent;

i.      Whether Defendant's acts, inactions, and practices complained of herein breached contracts with Plaintiffs and Class Members;

j.      Whether Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon it by Plaintiffs and Class Members; and

k.      Whether Plaintiffs and Class Members are entitled to damages, punitive damages, treble damages, and/or injunctive or other equitable relief.

129.    **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class, in that Plaintiffs and Class Members sustained damages arising out of the same acts and omissions of Defendant relating to its failure to protect, oversee, monitor, and safeguard the PII/PHI.

130.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs' claims are made in a representative capacity on behalf of the other members of the Class. Plaintiffs have no interests antagonistic to the interests of the other members of the Class and are subject to no unique defenses. Plaintiffs have retained competent counsel to prosecute the case on behalf of Plaintiffs and the Class. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so.

131.    **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all of Plaintiffs' and Class Members' PII/PHI was unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class

members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

132. **Superiority**: This case is appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small in comparison to the burden and expense of individual prosecutions of litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties and the court systems of many states and federal districts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort and expense will be fostered, and uniformity of decisions ensured.

133. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's practices challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge to those practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

## VI.    CAUSES OF ACTION

### COUNT I
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

134.    Plaintiffs reallege and reincorporate every allegation set forth in the preceding paragraphs as though fully set forth herein.

135.    Plaintiffs and Class Members were required to provide their PII/PHI to Premier.

136.    In providing their PII/PHI, Plaintiffs and Class Members had a reasonable expectation that reasonable care would be exercised in the protection of their PII/PHI.

137.    Defendant, as a covered entity under HIPAA, had a duty to take reasonable measures for file transfers to protect the PII/PHI of Plaintiffs and Class Members from unauthorized disclosure to third parties.

138.    Defendant has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiffs and Class Members could and would suffer if the PII/PHI were wrongfully disclosed in a Data Breach.

139.    Defendant knew or reasonably should have known that the failure to exercise due care in protecting PII/PHI, involved an unreasonable risk of harm to Plaintiffs and Class Members.

140.    Defendant had a duty to exercise reasonable care to prevent Plaintiffs' and Class Members' information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, ensuring that it and its business partners used file transfer software that would secure and protect Plaintiffs' and Class Members' PII/PHI.

141.    Defendant also had a duty to implement and maintain procedures to detect and prevent the improper access, exfiltration, and misuse of PII/PHI.

142.    Defendant's duty to use reasonable security measures arose as a result of Defendant's duty as a Covered Entity. See 45 C.F.R. § 160.103.

143.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and Class Members was reasonably foreseeable, particularly in light of the flaws in Progress' MOVEit software that was discovered in May 2023, the detailed warnings published by governmental agencies, and news reports of other data breaches.

144.    Plaintiffs and Class Members were the foreseeable and probable victims due to the fact that it was their PII/PHI that Premier possessed, stored, and transferred. Defendant knew or should have known of the inherent risks in transferring files containing PII/PHI, and the critical importance of providing adequate security for that PII/PHI.

145.    Given that Premier obtains, stores, and transfers PII/PHI, the value of PII/PHI to cyber criminals, and the many reported data breaches, a foreseeable risk of harm to Plaintiffs and Class Members existed and exists.

146.    Plaintiffs and Class Members had no ability to protect their PII/PHI and had no sign that Defendant was failing to implement and maintain reasonable data security practices over their PII/PHI, until they received their notification letters.

147.    Defendant was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

148.    Defendant had a duty to securely store and transfer PII/PHI to prevent the unauthorized disclosure and unauthorized sharing of the PII/PHI to criminals.

149. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to secure and safeguard the PII/PHI of Plaintiffs and Class Members.

150. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent unauthorized dissemination of PII/PHI.

151. Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and Class Members the existence and scope of the Data Breach.

152. But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and Class members, the PII/PHI of Plaintiffs and Class Members would not have been compromised.

153. There is a close causal connection between Defendant's failure to protect the PII/PHI of Plaintiffs and Class Members and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members. The PII/PHI of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII/PHI.

154. As a direct and proximate result of Defendant's numerous negligent acts and omissions, Plaintiffs and Class Members are at a substantial, impending, and imminent risk of identity theft, and they have been forced to take mitigation steps, thereby incurring costs, to ensure their personal and financial safety.

155. Plaintiffs and Class Members must now closely monitor their financial and medical accounts to guard against future identity theft and fraud. Plaintiffs and Class Members have heeded

such warnings to mitigate against the imminent risk of future identity theft and financial loss. Such mitigation efforts included, and will include into the future, protective steps. The loss of time and other mitigation costs are tied directly to guarding against and mitigating against the imminent risk of identity theft.

156.    As a direct and proximate result of Defendant's numerous negligent acts and omissions, Plaintiffs and Class Members have suffered actual and concrete injuries and will suffer additional injuries into the future, including economic and non-economic damages in the following forms: (a) invasion of privacy; (b) financial costs incurred mitigating the imminent risk of identity theft; (c) loss of time and loss of productivity incurred mitigating the imminent risk of identity theft, including medical identity theft; (d) loss of time and loss of productivity taking steps to mitigate the Data Breach, including the instructions in the Data Breach Notice; (e) the cost of future monitoring for identity theft, including medical identity theft; (f) loss of time and annoyance due to increased targeting with phishing attempts and fraudulent robo-calls; and (g) diminution of value of their PII/PHI.

157.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members are entitled to recover actual and punitive damages.

## COUNT II
### Negligence *per se*
### (On Behalf of Plaintiffs and the Class)

158.    Plaintiffs reallege and reincorporate every allegation set forth in the preceding paragraphs as though fully set forth herein.

159.    Defendant is a covered entity under HIPAA. A "covered entity" is defined in relevant part as a "health provider." 45 C.F.R. § 160.103. As a medical organization that provides

healthcare to patients and transmits health information in electronic form, Premier is a covered entity.

160.    Defendant violated HIPAA regulations, including by:

a.    Failing to ensure the confidentiality and integrity of electronic PHI that Defendant creates, receives, maintains, or transmits, in violation of 45 C.F.R. section 164.306(a)(1);

b.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. section 164.312(a)(1);

c.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. section 164.308(a)(1);

d.    Failing to identify and respond to suspected or known security incidents and mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. section 164.308(a)(6)(ii);

e.    Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. section 164.306(a)(2);

f.    Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding

individually identifiable health information, in violation of 45 C.F.R. section 164.306(a)(3);

g.      Failing to ensure compliance with HIPAA security standard rules by its workforce, in violation of 45 C.F.R. section 164.306(a)(4);

h.      Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. section 164.502, et seq.;

i.      Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. sections 164.530(b) and 164.308(a)(5); and

j.      Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI in compliance with 45 C.F.R. section 164.530(c).

161.    Defendant also violated the duties applicable to it under the Federal Trade Commission Act (15 U.S.C. § 45, et seq.) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC, pursuant to that Act, has concluded that a company's failure to maintain reasonable and appropriate data security for sensitive personal information is an "unfair practice" in violation of the FTC Act.

162.    "Section 5 of the FTC Act [15 U.S.C. § 45] is a statute that creates enforceable duties, and this duty is ascertainable as it relates to data breach cases based on the text of the statute

and a body of precedent interpreting the statute and applying it to the data beach context." *In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 407 (E.D. Va. 2020). "For example, in *F.T.C. v. Wyndham Worldwide Corp.,* 799 F.3d 236, 240 (3d Cir. 2015), the United States Court of Appeals for the Third Circuit affirmed the FTC's enforcement of Section 5 of the FTC Act in data breach cases." *Capital One*, 488 F. Supp. 3d at 407.

163. Plaintiffs and Class Members' PII/PHI was and is nonpublic personal information and customer information.

164. Plaintiffs and Class Members are in the group of persons that HIPAA and the FTC Act were enacted and implemented to protect, and the harms they suffered in the Data Breach as a result of Defendant's violations of HIPAA and the FTC Act were the types of harm the statutes and regulations are designed to prevent.

165. As a direct and proximate result of Defendant's numerous negligent acts and omissions, Plaintiffs and Class Members have suffered actual and concrete injuries and will suffer additional injuries into the future, including economic and non-economic damages in the following forms: (a) invasion of privacy; (b) financial costs incurred mitigating the imminent risk of identity theft; (c) loss of time and loss of productivity incurred mitigating the imminent risk of identity theft, including medical identity theft; (d) loss of time and loss of productivity taking steps to mitigate the Data Breach, including the instructions in the Data Breach Notice; (e) the cost of future monitoring for identity theft, including medical identity theft; (f) loss of time and annoyance due to increased targeting with phishing attempts and fraudulent robo-calls; and (g) diminution of value of their PII/PHI.

166.    As a direct and proximate result of the conduct of Defendant that violated HIPAA and the FTC Act, Plaintiffs and Class Members have suffered and will continue to suffer the foreseeable economic and non-economic harms as described herein.

167.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members are entitled to recover actual and punitive damages.

**COUNT III**
**Negligent Misrepresentation**
**(On Behalf of Plaintiffs and the Class)**

168.    Plaintiffs reallege and reincorporate every allegation set forth in the preceding paragraphs as though fully set forth herein.

169.    Defendant supplied false information for the guidance of others in the course of its business. As alleged above, Defendant falsely represented that its products and services were superior data security practices that would protect Plaintiffs and Class Members from the Data Breach, when in actuality, Defendant employed deficient and unreasonable data security practices.

170.    Defendant's representations were false and Defendant failed to exercise reasonable care in obtaining or communicating the information. Defendant's data security practices were unreasonable and deficient by:

a.    Failing to conduct proper and reasonable training and due diligence over vendors and employees and data security systems, practices, and procedures;

b.    Failing to conduct proper and reasonable due diligence over the employees, vendors or contractors that were the vector(s) of and/or facilitated the

hackers' infiltration into the system(s) storing Plaintiffs' and Class Members' PII/PHI;

c.    Failing to maintain reasonable and appropriate oversight and audits on its internal data security and its employees, vendors, or contractors that were the vectors of the hackers' infiltration into the system(s) storing Plaintiffs' and other Class Members' PII/PHI;

d.    Failing to implement and maintain reasonable safeguards and procedures to prevent the unauthorized disclosure of Plaintiffs' and other Class Members' PII/PHI;

e.    Failing to monitor and detect its confidential and sensitive data environment(s) storing Plaintiffs' and other Class Members' PII/PHI reasonably and appropriately in order to repel or limit the Data Breach;

f.    Failing to implement and maintain reasonable data storage and retention procedures with respect to the PII to ensure the PII was being stored and maintained for legitimate and useful purposes;

g.    Failing to undertake reasonable and sufficient incident response measures to ensure that the ransomware attack directed toward Defendant's sensitive business information would not expose and cause disclosure and unauthorized acquisition of Plaintiffs' and other Class Members' PII/PHI;

h.    Failing to reasonably conduct forensic investigation into the scope, nature, and exposure of the Data Breach or to ascertain its full severity;

i.  Failing to provide full disclosure, deceptively misleading consumers through false representations and misleading omissions of fact regarding the Data Breach, consumers' risk and exposure caused by the Data Breach, and the adequacy of the investigation of and response to the Data Breach; and

j.  Failing to provide accurate, complete, and sufficiently detailed notification to Plaintiffs and other Class Members regarding the circumstances of the Data Breach, its causes, its effects, the extent of the exposure of their PII/PHI, and details regarding the disposition of Plaintiffs' and Class Members' PII at all times during the Data Breach.

171.    Plaintiffs and Class Members justifiably relied on Defendant's false information and were induced to obtain Defendant's products and services in reliance thereon.

172.    As a direct and proximate result of Defendant's numerous negligent acts and omissions, Plaintiffs and Class Members have suffered actual and concrete injuries and will suffer additional injuries into the future, including economic and non-economic damages in the following forms: (a) invasion of privacy; (b) financial costs incurred mitigating the imminent risk of identity theft; (c) loss of time and loss of productivity incurred mitigating the imminent risk of identity theft, including medical identity theft; (d) loss of time and loss of productivity taking steps to mitigate the Data Breach, including the instructions in the Data Breach Notice; (e) the cost of future monitoring for identity theft, including medical identity theft; (f) loss of time and annoyance due to increased targeting with phishing attempts and fraudulent robo-calls; and (g) diminution of value of their PII/PHI.

173.    As a direct and proximate result of Defendant's negligent misrepresentation, Plaintiffs and Class Members are entitled to recover actual and punitive damages.

## COUNT IV
**Negligent Entrustment**
**(On Behalf of Plaintiffs and the Class)**

174.    Plaintiffs reallege and reincorporate every allegation set forth in the preceding paragraphs as though fully set forth herein.

175.    Premier owed a duty to Plaintiffs and Class Members to adequately safeguard the Private Information that it required its customers to provide. Part and parcel of this duty was the duty to only entrust that data to third-party vendors with adequate and reasonable security measures and systems in place to prevent the unauthorized disclosure of such data.

176.    Premier breached this duty by entrusting Welltock with the Private Information of its patients when, as described throughout the Complaint, it knew or should have known that Welltock utilized Progress' MOVEit software which was incompetent at preventing such unauthorized disclosure.

177.    As a direct and proximate result of Defendant's failure to exercise reasonable care in selecting with whom to entrust its patients' Private Information, the personal data of Defendant's patients was accessed by ill-intentioned criminals who could and will use the information to commit identity theft or financial fraud. Plaintiffs and Class Members face the imminent, certainly impending and substantially heightened risk of identity theft, fraud, and misuse of their personal data.

178.    As a direct and proximate result of Defendant's numerous negligent acts and omissions, Plaintiffs and Class Members have suffered actual and concrete injuries and will suffer

additional injuries into the future, including economic and non-economic damages in the following forms: (a) invasion of privacy; (b) financial costs incurred mitigating the imminent risk of identity theft; (c) loss of time and loss of productivity incurred mitigating the imminent risk of identity theft, including medical identity theft; (d) loss of time and loss of productivity taking steps to mitigate the Data Breach, including the instructions in the Data Breach Notice; (e) the cost of future monitoring for identity theft, including medical identity theft; (f) loss of time and annoyance due to increased targeting with phishing attempts and fraudulent robo-calls; and (g) diminution of value of their PII/PHI.

179.    As a direct and proximate result of Defendant's negligent entrustment, Plaintiffs and Class Members are entitled to recover actual and punitive damages.

## **COUNT V**
### **Breach of Contract**
### **(On Behalf of Plaintiffs and the Class)**

180.    Plaintiffs reallege and reincorporate every allegation set forth in the preceding paragraphs as though fully set forth herein.

181.    Premier and Plaintiffs and Class Members entered into contracts wherein Premier agreed to provide health care to its patients and promised to safeguard, secure, and protect Plaintiffs' and Class Members' PII/PHI. Premier also implicitly promised to timely and accurately provide notification if Plaintiffs' and Class Members' PII/PHI had been breached and compromised or stolen.

182.    Plaintiffs and Class Members fully performed their obligations under the contracts.

183.    Premier breached its contracts when it failed to safeguard, secure, and protect the PII/PHI of Plaintiffs and Class Members and allowed unauthorized persons to access and exfiltrate the PII/PHI.

184.    As a direct and proximate result of Premier's breach of its contract, Plaintiffs and Class Members are at a substantial, impending, and imminent risk of identity theft (including medical identity theft), and they have been forced to take mitigation steps, to ensure their personal and financial safety.

185.    As a direct and proximate result of Defendant's numerous negligent acts and omissions, Plaintiffs and Class Members have suffered actual and concrete injuries and will suffer additional injuries into the future, including economic and non-economic damages in the following forms: (a) invasion of privacy; (b) financial costs incurred mitigating the imminent risk of identity theft; (c) loss of time and loss of productivity incurred mitigating the imminent risk of identity theft, including medical identity theft; (d) loss of time and loss of productivity taking steps to mitigate the Data Breach, including the instructions in the Data Breach Notice (e) the cost of future monitoring for identity theft, including medical identity theft; (f) loss of time and annoyance due to increased targeting with phishing attempts and fraudulent robo-calls; and (g) diminution of value of their PII/PHI.

186.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and Class Members are entitled to recover actual, consequential, and nominal damages.

**COUNT VI**
**Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Class)**

187.    Plaintiffs reallege and reincorporate every allegation set forth in the preceding paragraphs as though fully set forth herein.

188.    Plaintiffs and Class Members have objective reasonable expectations of solitude and seclusion in their personal and private information and the confidentiality of the content of personal information and non-public medical information.

189.    Defendant intruded upon that seclusion by allowing the unauthorized access to the Plaintiffs' and Class Members' Private Information without Plaintiffs' and Class Members' consent, knowledge, authorization, notice, or privilege by negligently maintaining the confidentiality of Plaintiffs' and Class Members' information as set out above.

190.    Defendant's breach of confidentiality resulted in insecure systems allowing harmful disclosure of the information to criminals and criminal data markets.

191.    The intrusion was offensive and objectionable to Plaintiffs, the Class Members and to a reasonable person or ordinary sensibilities in that Plaintiffs' and Class Members' Private Information was disclosed without prior written authorization of Plaintiffs and Class Members.

192.    The intrusion was into a place or thing which was private and is entitled to be private, in that Plaintiffs and Class Members provided and disclosed their Private Information to Defendant privately with the intention that the Private Information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable to believe that such information would be kept private and would not be disclosed without consent. Plaintiffs and Class Members were further reasonable to believe that the Private Information would be reasonably protected against third-party criminal extraction through foreseeable hacking activity.

193.    This improper disclosure increased the risk that the personal data was delivered to criminal data markets thereby increasing the risk of identity theft to Plaintiffs and Class Members.

194.    The harm included the erosion of the essential confidential relationship between the patient and the healthcare provider.

195.    As a direct and proximate result of Defendant's unauthorized disclosure, Plaintiffs and Class Members have suffered actual and concrete injuries and will suffer additional injuries into the future, including economic and non-economic damages in the following forms: (a) invasion of privacy; (b) financial costs incurred mitigating the imminent risk of identity theft; (c) loss of time and loss of productivity incurred mitigating the imminent risk of identity theft, including medical identity theft; (d) loss of time and loss of productivity taking steps to mitigate the Data Breach, including the instructions in the Data Breach Notice; (e) the cost of future monitoring for identity theft, including medical identity theft; (f) loss of time and annoyance due to increased targeting with phishing attempts and fraudulent robo-calls; and (g) diminution of value of their PII/PHI.

<u>**COUNT VII**</u>
**Disclosure of Non-Public Information**
**Pursuant to *Biddle v. Warren Gen. Hosp.*, 86 Ohio St. 3d 395 (1999)**
**(On Behalf of Plaintiffs and the Class)**

196.    Plaintiffs reallege and reincorporate every allegation set forth in the preceding paragraphs as though fully set forth herein.

197.    In Ohio, medical providers have an obligation to their patients to keep non-public medical information completely confidential.

198.    Disclosure of medical information by a medical provider in Ohio without consent results in civil liability.

47

199.    Plaintiffs and Class Members are each patients of Defendant.

200.    Plaintiffs and each Class Member had a reasonable expectation of privacy in their Private Information.

201.    Contrary to its legal obligations as a medical provider, and its implied contract to maintain the confidentiality of its patients, Defendant disclosed the information without Plaintiffs' or Class Members' consent.

202.    In addition, by and through its negligence, and/or in combination with Premier's negligence, Plaintiffs' and Class Members' Private Information was disclosed to a third-party criminal enterprise.

203.    This improper disclosure increased the risk that the personal data was delivered to criminal data markets thereby increasing the risk of identity theft to Plaintiffs and Class Members.

204.    The harm included the erosion of the essential confidential relationship between the patient and the healthcare provider.

205.    As a direct and proximate result of Defendant's unauthorized disclosure, Plaintiffs and Class Members have suffered actual and concrete injuries and will suffer additional injuries into the future, including economic and non-economic damages in the following forms: (a) invasion of privacy; (b) financial costs incurred mitigating the imminent risk of identity theft; (c) loss of time and loss of productivity incurred mitigating the imminent risk of identity theft, including medical identity theft; (d) loss of time and loss of productivity taking steps to mitigate the Data Breach, including the instructions in the Data Breach Notice; (e) the cost of future monitoring for identity theft, including medical identity theft; (f) loss of time and annoyance due

to increased targeting with phishing attempts and fraudulent robo-calls; and (g) diminution of value of their PII/PHI.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs, individually and on behalf of the Class, request that the Court:

A.    Find that this action satisfies the prerequisites for maintenance as a class action and certify the Class defined herein;

B.    Appoint Plaintiffs as representatives of the Class;

C.    Appoint Plaintiffs' counsel as counsel for the Class;

D.    Enter judgment in favor of Plaintiffs and the Class against Premier;

E.    Award Plaintiffs and Class Members actual damages and all other forms of available relief, as applicable;

F.    Award Plaintiffs and the Class attorney's fees and costs, including interest thereon as allowed or required by law;

G.    Enter an injunction requiring Defendant to adopt, implement, and maintain adequate security measures to protect its customers' personal and financial information;

H.    Award Plaintiffs and Class Members pre- and post-judgment interest, to the extent allowable; and

I.    Grant all such further and other relief as the Court deems just and appropriate.

Respectfully Submitted

*/s/ Brian D. Flick*
Brian D. Flick (0081605)
Marc E. Dann (0039425)
Andrew M. Engel (0047371)
DannLaw
15000 Madison Avenue
Cleveland, Ohio 44107

49

(216) 373-0539 telephone
(216) 373-0536 facsimile
notices@dannlaw.com

*/s/ Thomas A. Zimmerman, Jr.*
Thomas A. Zimmerman, Jr.
(*pro hac vice* forthcoming)
tom@attorneyzim.com
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
www.attorneyzim.com

*Counsel for Plaintiffs and the Putative Class*

## DEMAND FOR JURY TRIAL

Plaintiffs, Gloria Pierce, Christine Hughes, and Michael Finley, demand a trial by jury of any and all issues in this action so triable of right.

*/s/ Brian D. Flick*
Brian D. Flick (0081605)
Marc E. Dann (0039425)
Andrew M. Engel (0047371)
DannLaw
*Counsel for Plaintiffs and the Putative Class*